UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SAINT ALPHONSUS HEALTH ALLIANCE, INC. f/k/a ADVANTAGE CARE NETWORK, INC., an Idaho corporation; SAINT ALPHONSUS HEALTH SYSTEM, INC., an Idaho corporation; ST. LUKE'S HEALTH SYSTEM, LTD.; and ST. LUKE'S REGIONAL MEDICAL CENTER, LTD., <br><br>      Plaintiffs, <br><br>      v. <br><br> CORIZON, LLC, f/k/a CORRECTIONAL MEDICAL SYSTEMS, INC., a Missouri limited liability company; and CORIZON HEALTH, INC., a Delaware corporation, <br><br>      Defendants. | Case No. 1:18-cv-00183-DCN <br><br> **MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court are numerous Motions filed by the parties in this case.

Defendants Corizon, LLC, and Corizon Health, Inc. ("Corizon") have filed two Motions

to Compel (Dkts. 44, 81) as well as a Motion to Appoint Special Discovery Master (Dkt.

94). Plaintiffs Saint Alphonsus Health Alliance, Inc. and Saint Alphonsus Health System,

Inc. ("St. Als") filed a Motion for Protective Order (Dkt. 53) which Plaintiffs St. Luke's

Health System, Ltd. and St. Luke's Regional Medical Center, Ltd. ("St. Luke's") (collectively "the Hospitals") joined (Dkt. 54). Non-Party Ada County has also filed a Motion to Quash. Dkt. 55.

Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will rule on the motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). Upon review, and for the reasons set forth below, the Court GRANTS in PART and DENIES in PART both Motions to Compel, GRANTS the Hospitals' Motion for Protective Order, GRANTS Ada County's Motion to Quash, and DENIES Corizon's Motion to Appoint Special Discovery Master.

## II. BACKGROUND

In this consolidated case, the Hospitals contend that Corizon owes them millions of dollars more than what they already paid—on behalf of the Idaho Department of Correction—for healthcare services they provided to Idaho state prison inmates from roughly 2014 to 2018. The claims in this case are for equitable relief under theories of quantum meruit and unjust enrichment. These claims fundamentally depend on a determination of the fair market value—and the reasonableness of that value—of various medical charges.

In approximately March of 2019, Corizon requested the Hospitals' payor data, *i.e.* information illustrating what the Hospitals billed, and received, for healthcare services to various patients over the last several years. The Hospitals objected, claiming the

MEMORANDUM DECISION AND ORDER - 2

information is not relevant to the claims and defenses in this litigation. In October 2019, the parties sought the Court's assistance through the Court's informal discovery dispute process. Ultimately, the Court advised the parties that the information appeared relevant and needed to be turned over. The Hospitals elected not to turn the information over.[1]

On February 4, 2020—after not receiving anything from the Hospitals for approximately three months—Corizon filed a Motion to Compel. Dkt. 44. The Hospitals oppose the Motion. Dkts. 46, 47. On February 11 and February 14, 2020, Corizon served subpoenas on various third parties seeking much of the same information it was seeking from the Hospitals. On March 2, 2020, St. Als moved for a Protective Order asking that the Court shield those third-party entities from responding to Corizon's subpoenas. Dkt. 53. St. Luke's joined in the Motion. Dkt. 54. As part of that Motion, the Hospitals asked the Court to shorten the briefing schedule on the Motion itself and to issue an order excusing the third parties from compliance until the Court had an opportunity to make its final determination. Before the Court could rule on the Hospitals' Motion, however, one of the third parties (Ada County) filed a Motion to Quash. Dkt. 55. The Court subsequently granted the Hospitals' request to shorten the briefing schedule and excused the third parties from compliance until it had a chance to rule on the Motion. Dkt. 56.

On March 10, 2020, Corizon replied to its Motion to Compel (Dkt. 57) and on March

---

[1] Corizon has much to say about this process and the Hospitals' failure to "comply" with the Court's directive. As St. Als correctly notes, however, the Court's discovery dispute process is not binding on the parties. Dkt. 47, at 3 n.2. The Hospitals decision to continue resisting the discovery requests (and opposing the instant Motion to Compel) is not a violation of any Court order or ruling and is, therefore, allowed.

13, 2020, it responded to the Hospitals' Motion for Protective Order (Dkt. 58). A week later, the parties jointly moved the Court for an order staying all discovery while they engaged in mediation. Dkt. 59. The Court obliged and stayed the case. Dkt. 60.

In early July 2020, the parties informed the Court that mediation had been unsuccessful and that they were ready to proceed with discovery. The Court lifted the stay and reset certain deadlines that were outstanding. Dkts. 62, 63. A flurry of flings ensued.[2]

In October 2020, the parties again brought a dispute regarding discovery to the Court's attention. This time, chargemaster rates were at issue. In short, chargemaster rates are rates that hospitals charge for all of their items, services, and procedures. The chargemaster rates are, however, similar to a retail list of prices in that very few payors actually pay the chargemaster rates. In an almost identical pattern to the prior dispute and motion, Corizon sought this information from St. Luke's,[3] St. Luke's objected, the Court and parties engaged in an informal discovery mediation, the Court advised St. Luke's that the information seemed relevant and discoverable, St. Luke's elected not to produce it, and eventually, on October 16, 2020, Corizon filed a Motion to Compel. Dkt. 81.

After briefing on that Motion concluded, Corizon filed a Motion for Discovery and

---

[2] These submissions include St. Luke's Notice that it had produced the discovery Corizon sought (Dkt. 66) and Corizon's rejection of that contention (Dkt. 71); Corizon's Notice of Supplemental Authority (Dkt. 69) and St. Luke's Motion to Strike that supplemental authority (Dkt. 72); Corizon's Notice of Service of Amended Subpoenas (Dkt. 68), and various responses, replies, and sur-replies. The Court has already dealt with some of the motions (*See* Dkts. 73, 75) and will give any of the other submissions the weight it deems appropriate.

[3] Corizon only filed this Motion against St. Luke's. The parties elected to essentially wait and see how the Court ruled on the instant motion before undertaking similar discovery (and potentially similar disagreements) with St. Als.

to Appoint a Special Master. Dkt. 94. In this Motion, Corizon recounts the numerous discovery disputes in this case, reiterates those that are still open (and awaiting decisions from the Court), and outlines the high likelihood of future disputes. Corizon then asked the Court to appoint a special master for the purpose of assisting the Court in past (and future) discovery disputes. The Hospitals jointly oppose the Motion. Dkt. 95.

The Court will address each motion in turn—including any applicable legal standard and other relevant background.

## III. ANALYSIS

### A. Motion to Compel Payor Rate Data (Dkt. 44)

*1. Legal Standard*

Discovery is permitted "regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Relevant information "need not be admissible in evidence to be discoverable." *Id.* A party may move for an order compelling a discovery response pursuant to Federal Rule of Civil Procedure 37(a)(3)(B).

Under Federal Rule of Civil Procedure 37, a party may move to compel discovery responses if, among other things, an opposing party fails to answer interrogatories or produce requested documents. Fed. R. Civ. P. 37(a)(3)(B)(iii)-(iv). "While the moving party must make a threshold showing of relevance . . . the party resisting discovery carries the 'heavy burden' of showing specifically why the discovery request is irrelevant, unduly burdensome, disproportional to the needs of the case, or otherwise improper." *Strojnik v. Block 22 LLC*, No. 1:18-cv-00556-BLW, 2019 WL 6315523, at *2 (D. Idaho Nov. 25, 2019) (internal citation omitted).

*2. Discussion*

In opposition to Corizon's Motion to Compel this data, the Hospitals have put forth arguments about proportionality and burden, but their main contention is that the rate payor information is simply not relevant to the case. In their estimation, the data is unrelated to any determination of what the fair market value of its services were and any damages Corizon must pay. In order to understand this argument, further background is helpful.

The Court and counsel have often referred to the various payors of the Hospitals' bills as falling into four general categories, or buckets. The first category is "contracting commercial payors." These payors have negotiated contracts with the Hospitals for discounts off of the Hospitals' full billed charges. Corizon was such a payor prior to July 1, 2014. The second category is "non-contracting commercial payors." These payors do not have contracts with the Hospitals and are subject to full billed charges. Corizon was such a payor from July 1, 2014, to March 26, 2018. The third category consists of statutory payors such as Medicaid, Medicare, and County inmates and indigent persons whose rates are set by state statute. The fourth and final category of payors are those who are uninsured.

The Hospitals contend that because Corizon was a non-contracting payor during the time in question, it need only receive discovery regarding similarly situated payors—i.e. other non-contracting payors—and *any* information about contracting payors, statutory payors, or uninsured payors is irrelevant. In other words, the Hospitals argue that because Corizon could never be a statutory payor and would never find itself in the same bucket as an uninsured payor, there is little reason to include in discovery what the Hospitals charge payors who fall into those buckets. The Court disagrees.

MEMORANDUM DECISION AND ORDER - 6

The Hospitals' entire argument rests on an undetermined question: how to calculate the fair market value of their services. While both sides have presented some caselaw *suggesting* how a factfinder could calculate various rates, the matter is clearly unsettled. What's more, the parties have not asked the Court to determine that issue at this time.

Now, the Court *may* eventually determine that the best way to calculate the fair market value in this case is to only look at similarly situated payors (i.e. only people in the same category as Corizon), but it might also utilize a broader, across-the-board approach (e.g. by looking at all payors and averaging the costs), or some other computation. The Court has not made that determination; however, it is concerned the Hospitals' approach could result in disproportionate or misleading figures.

As Corizon notes, under the Hospitals' methodology, the fair market value would, in essence, change depending on the recipient. In other words, the outcome would not be the fair market value for a given medical service, but it would be the fair market value of that service *as applied to a specific recipient.* This approach does not sit well with the Court.[4] The Hospitals, themselves, appear to agree with this conclusion when they state— in briefing on their Motion for Protective Order—that "the focus [of this case] is plainly on the value of the services provided, and not the recipient of the services." Dkt. 65, at 2 (citing *Farrell v. Whitmean*, 268 P.3d 458, 463 (Idaho 2021) and the proposition that value

---

[4] To wit, it is difficult to accept that a certain rate is "fair" if it differs from payor to payor. The Court is not dismissing the Hospitals' argument outright. As explained below, there are shortcomings in the "broad" approach as well. However, it seems antithetical to say a particular fee is "fair" or the "going rate," when it changes depending on a variety of circumstances. Again, maybe those circumstances warrant different pricing; maybe they do not. But because the Court has not yet been asked to determine how the rate should be calculated in this case, there is little wisdom in limiting the data to one methodology.

MEMORANDUM DECISION AND ORDER - 7

is "an objective measure and is proven by evidence demonstrating the nature of the work and the customary rate of pay for such work in the community at the time the work was performed").

To be fair, there are potential problems with a "broad" approach to valuation as well. For example, the contracted payors have engaged in arms-length negotiations with the Hospitals for their rates and the way those were set may or may not apply to an overall prevailing market rate. In like manner, statutory rates (as the name suggests) are set by statute so could it truly be said that those are market rates, or are they simply a function of legislation and irrelevant to the overall calculation? The Court does not know. But that is precisely the point.

The Hospitals will have ample opportunity to argue why the Court (and/or a jury) should or should not consider certain factors in its analysis of the fair market value of services. However, no fact finder will be able to do that without the information before it.[5]

In sum, under the broad provisions of Federal Rule of Civil Procedure 26, Corizon is entitled to engage in this discovery in order to defend against the Hospitals' claims and in support of its argument on how to calculate the fair market value of damages. The Court does not know the scope or impact this particular data will have; but this is a discovery question. Broad discovery parameters necessarily mean that some endeavors may yield

---

[5] The Hospitals argue that Corizon made itself a non-contracting payor by electing not to honor its previous contract and that it should not now—after the fact—be allowed to discover what others paid (who honored their contracts) in an attempt to justify its underpayments. This is a compelling argument. Again, however, it is an argument that can be made at a later time. For now, the discovery must be turned over so that each side can best prepare its case.

better results than others, but that is part and parcel to litigation. Fairness dictates both sides have an opportunity to glean information regarding their claims and defenses. *See* Fed. R. Civ. P. 26.

That overarching finding aside, the Court wishes to address four concerns it has about the *process* this discovery shall take and outline certain parameters.

First, the Hospitals accuse Corizon of shifting the goalposts of their requests, of failing to include the specific requests with its motion as required by local rule, and of essentially asking for discovery that is not actually outlined in their requests. The Court agrees in part. Corizon's current requests are not verbatim outlined in any single discovery request. Nevertheless, the substance is clearly there. What's more, it appears that Corizon modified its requests in an effort to resolve the disputes between the parties. It changed some of the timeframes, as well as some of the data sought, but that does not necessitate the Court striking the request in itself. However, for organizational purposes (and frankly because the Court does not want to set a precedent of compelling discovery that is *technically* not listed) it will ask that Corizon serve anew its requests on the Hospitals seeking the information outlined in its motion—"services the Hospitals provided in [location to be discussed below] from [dates to be discussed below] including: a unique patient identifier, the date of service, the primary treatment, the amount billed, the amount received, and the payor type [discussed below]." (Dkt. 44, at 8).

Second, the Court is not convinced Corizon needs information from 2011 to the

present, [6] or from locations throughout the state of Idaho. The Hospitals argue that only information from the relevant time period is necessary[7] and only information from the treasure valley is appropriate. They also argue that some of the older data is difficult to compile. The Court finds Corizon's point well taken that it needs some information outside of the timeframe in question to assess whether rates increased or decrease at a faster or slower rate (or were unusually high or low) because those factors could bear on the question of the reasonableness of the value the Hospitals have placed on these services. Nevertheless, Corizon *was* a contracted payor from 2011-2014 so it already generally knows the data from that time period. Weighing the competing factors, the Court finds it appropriate to expand the timeframe to some degree, but not as wide as Corizon desires. A medical bill from 2011 has only marginal relevance to a similar bill from 2014 or 2018. So while the critical data will come from the timeframe of the lawsuit—July 1, 2014-March 26, 2018 (for St. Luke's) and February 10, 2015-March 26, 2018 (for St. Als)—the Court finds it appropriate to begin the data collection from the start of the *prior* calendar year to the end of the final calendar year. In other words, St. Luke's shall produce the requested data for all buckets from January 1, 2013, through December 31, 2018, and St. Als. shall produce the requested data for all buckets from January 1, 2014, through December 31, 2018.

---

[6] It *appears* Corizon has modified its requests to set the end of 2018 as the end date—as opposed to present-day—however, that is not entirely clear from the briefing.

[7] That said, the Hospitals have already produced information from outside of that timeframe. This will be discussed below as part of the Court's fourth concern.

In contrast to its conclusion that some "wiggle-room" is appropriate when it comes to the date range at issue, the Court finds there is little support for Corizon's contention that it needs to look outside of the treasure valley to determine Boise's market rate. Corizon agrees that the applicable caselaw is fairly clear that the relevant market (for any questions of valuation) is the geographical area in which medical provider is situated. It asserts, however, that there may be some utility in having information from other areas within Idaho where Corizon sent patients for treatment in order to assess the fair market value of the Hospitals' services (and the reasonableness thereof) in the treasure valley.[8] The Court disagrees.

Corizon seems to be suggesting that pricing on a foot surgery (for example) in rural Idaho could help determine whether pricing on a foot surgery in Boise is reasonable. But the question of reasonableness is not determined by comparing similar medical procedures in *different* markets, but by comparing similar medical procedures *within the given market* itself and analyzing the value of those services vis-à-vis consumers' willingness to pay for

---

[8] Corizon argues that because it produced data in response to the Hospitals' discovery requests concerning the rates it pays not only in Boise (or throughout Idaho) but in *all states* where it operates, the Hospitals should have to produce this expanded information as well. Corizon originally argued their information from other states was irrelevant; however, after the Court suggested the information appeared relevant and should be turned over, Corizon did so. The Court understands Corizon's quasi-equity argument, but 1) Corizon already turned the information over of its own volition, and 2) there is a slight difference in the requests because Corizon pays for medical services in various states (which could bear on the reasonableness of its position regarding payment), whereas the Hospitals in this case only operate in a certain region of Idaho.

those services.[9] Accordingly, in addition to limiting the timeframe, the Court will also limit the scope of the data to the treasure valley.

The Court's third concern is privacy. While St. Luke's and St. Als are co-plaintiffs in this case they are, nonetheless, competitors. For ethical reasons (including principles of anti-trust) the Court is concerned about one hospital seeing a particular payor's negotiated rate with the other hospital. There is a robust protective order in this case,[10] and the Court assumes this data will be designated as attorney's eyes only (as has already been the case with similar materials). Nevertheless, the Court finds it appropriate, assuming feasible,[11] to *not* require the Hospitals to list the individual commercial payor's name (whether contracted or not) but to instead list just that: "contracted payor," and "non-contracted

---

[9] The Court does not mean to split a hair too finely here. The data could reveal, for example, that a certain medical procedure is the same cost everywhere in Idaho *but* the treasure valley. However, this does not necessarily mean the treasure valley rates are unreasonable *for the treasure valley*. If the rates are higher or lower than other locations in Idaho, it could be argued they are unreasonable *when compared to those other areas*; but again, it does not mean they are not, in fact, fair for the market that is under analysis. A particular market's value is inherently what the rates are in that location (irrespective of where they fall when compared to other locations). Additionally, Corizon *seems* to be suggesting that the Hospitals only want to use the treasure valley rates because they are higher. This may or may not be true. The rates for some services might be higher in the treasure valley because it is a larger metropolitan area and things generally cost more. That said, the rates could also be lower based on resources. For example, a procedure that a small-town physician may deem rare or specialized (and charge more for) may be more commonplace in a larger setting such as the treasure valley and not cost as much. In short, the costs for other locations might shed light on the different market rates throughout Idaho, but will not aid the Court in determining the fair value of services in this market—the treasure valley—where the services at issue in this lawsuit were almost exclusively located.

[10] The protective order that governs this case was originally entered in the companion case (Case No. 1:18-cv-00289, Dkt. 25) but was adopted in this, the lead case, at Dkt. 37.

[11] The Court says "feasible" because it might be *more work* to change entries from a company name (UnitedHealth, Blue Cross etc.) to the categorical designation. Thus, while this is the Court's *preference*, it is only so assuming it will not incur undue additional time and expense on the Hospitals. If the Court's preference is unworkable, the payor names can appear and the Court's second requirement (that of strict adherence to the protective order) becomes all the more crucial.

MEMORANDUM DECISION AND ORDER - 12

payor." Additionally, the Court can only assume that someone other than the attorneys in this case are going to need to review this information (the parties' experts for example). If it becomes clear the information needs to be disseminated to others, the parties shall submit an addendum to the existing protective order which shall outline the use of this information. That addendum shall include an acknowledgement, or agreement, that any witness must sign verifying he or she has reviewed the terms of the protective order and agrees to be bound by it.[12]

The Court's final concern can best be described by the phrase: "what's done is done." During the briefing process of the various motions (and afterward), the Hospitals provided various spreadsheets, summaries, and charts in an effort to appease Corizon. Corizon felt that the summaries were insufficient and did not meet their discovery requests. In granting Corizon's Motion today, the Court simply notes that any materials already produced (regardless of whether they comply with the Court's above parameters or not) stand and can be utilized by the parties. That said, if there is something within a report or summary that Corizon seeks further information on, but it is precluded by today's order, the Hospitals need not produce anything further.[13]

---

[12] An example of such a form can be seen in Case No. 1:16-cv-00449, Dkt. 36-1, at 20–21, or Case No. 4:18-cv-00571, Dkt. 52-1, at 18–19.

[13] For example, even if the Hospitals produced a summary that includes data from 2011, Corizon cannot seek further information on that 2011 information because the Court's order today is that only data from January 1, 2013 (and January 1, 2014 respectively) to December 31, 2018, must be turned over. Additionally, Corizon claims that because some of the information provided during the interim included data from *after* March 26, 2018, the Hospitals have waived any claim to withholding information after that date. Again, anything that has been produced stands, but moving forward, the Hospitals need only produce the information within the timeframe outlined by the Court.

In conclusion, Corizon's Motion to Compel is GRANTED in PART and DENIED in PART as outlined above. Corizon shall resend an appropriate request seeking data on "services the Hospitals provided in the treasure valley from [January 1, 2013 (St. Luke's); January 1, 2014 (St. Als)] to December 31, 2018, including: a unique patient identifier, the date of service, the primary treatment, the amount billed, the amount received, and the payor type." The Hospitals shall timely respond.[14]

## B.  Motion for Protective Order (Dkt. 53) / Motion to Quash (Dkt. 55)

### 1. Background

As noted, on February 11, 2020, Corizon served a subpoena on a third-party entity, Myers & Stauffer, LC. On February 14, 2020, Corizon served subpoenas on ten different county sheriffs in Idaho. Each subpoena requested information regarding the Medicaid/Medicare rates and/or statutory rates various persons and groups paid to the Hospitals over certain years for various medical services. *See* Dkt. 53-3, 53-4.

On March 2, 2020, St. Als moved for a Protective Order shielding those third-party entities from responding to Corizon's subpoenas. Dkt. 53. St. Luke's joined in the Motion. Dkt. 54. The Court notes that the Hospitals did not ask for the subpoenas to be quashed outright, but for them to be pared down significantly in order to limit production to relevant

---

[14] The Hospitals also argue they are willing to produce the information sought, but that Corizon should pay for such production. The Court will not so order. The standard practice is for the producing party to incur the necessary expenses. Fees, reimbursements, and other monetary relief can be sought out (and determined) at a later point, if necessary.

information and lessen the overall burden.[15]

As part of its Motion, the Hospitals asked the Court to shorten briefing on the Motion itself and to issue an order excusing the third parties from compliance until the Court had an opportunity to make its determination.

Before the Court could rule on the Hospitals' Motion, however, one of the third parties (Ada County) filed a Motion to Quash. Dkt. 55.

The Court subsequently granted the Hospitals' request to shorten the briefing and excused the third parties from compliance with the subpoenas until it had a chance to rule on the Motion. Dkt. 56. In contemporaneous communications, Corizon represented that during the pendency of the various motions, some of the entities had already responded to the subpoenas and produced relevant information.

*2. Legal Standard*

<u>a. Motion for Protective Order</u>

"Pre-trial discovery is ordinarily accorded a broad and liberal treatment" because "wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) (cleaned up). "Under Rule 26, however, '[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'" *In re Roman Catholic Archbishop of Portland*, 661 F.3d 417, 424 (9th Cir.

---

[15] The Hospitals did originally ask for eight of the subpoenas directed at county sheriffs be quashed for violating Federal Rule of Civil Procedure 45's 100-mile rule. Corizon eventually cured this deficiency by designating appropriate locations within 100 miles of the recipients.

2011) (quoting Fed. R. Civ. P. 26(c)(1)). "The party opposing disclosure has the burden of proving 'good cause,' which requires a showing 'that specific prejudice or harm will result' if the protective order is not granted." *Id.* (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003)).

b. Motion to Quash

Federal Rule of Civil Procedure 45(c)(3) provides that a Court *must* quash or modify a subpoena that:

> (i) fails to allow a reasonable time to comply;
> (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
> (iv) subjects a person to undue burden.

Additionally, the Court *may* quash or modify a subpoena if the subpoena requires:

> (i) disclosing a trade secret or other confidential research, development, or commercial information; or
> (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

Fed. R. Civ. P. 45(c)(3)(B)(i)-(ii). These Rules give the Court broad discretion in determining whether to quash a subpoena. The Court must consider the specific facts and circumstances surrounding the issues in making a sound and just determination.

*3. Discussion*

As the Court has previously held, it "does not like to burden third parties [with subpoenas] unless absolutely necessary." *Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC*, No. 4:16-CV-00427-DCN, 2017 WL 4839375, at *3 (D. Idaho Oct. 26,

2017). The burden placed on third parties is often much greater than the value of any production. The Court sees no reason to depart from its standard practice here.

As a threshold matter, the Court notes that the Hospitals have standing to object to the subpoenas. Despite Corizon's arguments to the contrary, the Hospitals' "interests" could be "jeopardized by [the] discovery sought from [these] third part[ies] and [they have] standing under Rule 26" to object and move for a protective order on their behalf. *See id.* at *3 (citing *In re REMEC, Inc. Sec. Litig.*, No. CIV 04CV1948 JLS AJB, 2008 WL 2282647, at *1 (S.D. Cal. May 30, 2008) and Federal Rule of Civil Procedure 26(c)(1)).[16] The Court will briefly address two reasons a protective order is appropriate in this case.

First, by Corizon's own admission, it sent these subpoenas because of the Hospitals' "refusal to produce responsive payor rate data." Dkt. 58, at 7. Insofar as the Court has now granted Corizon's Motion to Compel, there is no need to seek this information from third parties. The Hospitals are undoubtedly the best source for this data.

Second, the subpoenas are *extremely* broad and appear particularly burdensome for the larger counties at issue. For example, Canyon County noted that the subpoenaed materials would likely require "a couple of weeks" to review and process. Dkt. 65-3, at 2. In its Motion to Quash, Ada County noted that the work it would take to review *every* inmate in Ada County during the timeframe in question—including *any/all* medical information and/or bills—could take "hundreds of hours to complete." Dkt. 55-1, at 4, 5.

---

[16] Ada County clearly has standing to file its own motion to quash (apart from the Hospitals moving for a protective order on its behalf) because it was the direct recipient of a subpoena.

The Court does not believe Corizon's requests justify a third party incurring such time and expense. Thus, even without the Court's above finding on Corizon's Motion to Compel, it would have quashed, or severely limited, the subpoenas.

Thus, while other bases exist supporting the Court's decision today, it suffices the Court that, with its finding on Corizon's Motion to Compel in mind, the relevant information will be turned over and there will be no need to burden third parties. The Hospitals' Motion for Protective order is GRANTED and extends to all of the subpoenas in their entireties.[17] Ada County's Motion to Quash is also GRANTED. None of the third parties shall be required to respond to Corizon's subpoenas.

Similar to its holding above, the Court finds that any materials *already produced* to Corizon by any third party stand and can be used as appropriate.

## C. Motion to Compel Chargemaster Rates (Dkt. 81)

### 1. Legal Standard

Discovery is permitted "regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Relevant information "need not be admissible in evidence to be discoverable." *Id.* A party may move for an order compelling a discovery response pursuant to Federal Rule of Civil Procedure 37(a)(3)(B).

Under Federal Rule of Civil Procedure 37, a party may move to compel discovery

---

[17] As explained, even though the Hospitals only sought modifications to the subpoenas—as opposed to fully quashing them—the Court finds a protective order effectively quashing the subpoenas appropriate under the circumstances.

responses if, among other things, an opposing party fails to answer interrogatories or produce requested documents. Fed. R. Civ. P. 37(a)(3)(B)(iii)-(iv). "While the moving party must make a threshold showing of relevance . . . the party resisting discovery carries the 'heavy burden' of showing specifically why the discovery request is irrelevant, unduly burdensome, disproportional to the needs of the case, or otherwise improper." *Strojnik v. Block 22 LLC*, No. 1:18-cv-00556-BLW, 2019 WL 6315523, at *2 (D. Idaho Nov. 25, 2019) (internal citation omitted).

### 2. Discussion

The material Corizon seeks via this Motion to Compel[18] is not all that different from the materials it sought from the Hospitals in its first Motion to Compel and much of the same analysis applies.

Corizon seeks information regarding St. Luke's "chargemaster" rates. Chargemaster rates are the unadorned, non-discounted charges a hospital sets for various items, services, and procedures. *Typically*, hospitals set these rates high, anticipating they will be discounted—either through negotiations with various payors or by virtue of statute/some other mechanism. In short, the chargemaster rates are the "full-billed" rates. Corizon seeks not only the chargemaster rates themselves, but information regarding how St. Luke's set those rates.

---

[18] Corizon filed this Motion solely against St. Luke's. While similar requests have been (or will be) sent to St. Als, the parties essentially decided to wait until the Court ruled on Corizon's Motion against St. Luke's before moving forward with St. Als' production as the Court's holding as to St. Luke's will undoubtedly bear on any similar requests (and or disagreements) between Corizon and St. Als.

Initially, St. Luke's stated its chargemaster rates were not relevant. As Corizon correctly explains, however, the trial in this case will focus almost exclusively on damages and what is the reasonable value of various medical services. Dkt. 91, at 2. Because this case revolves around charges, rates, valuation, and reasonableness, the Court previously observed—during the information discovery dispute process—that the information appeared highly relevant and should be turned over. The Court noted that St. Luke's needed to turn the information over for review or affirmatively state it would not rely on it at trial when calculating damages. St. Luke's elected not to turn the information over—as was its prerogative.

After Corizon filed the instant motion, St. Luke's indicated it was going to turn over the requested information. *See* Dkt. 84. In light of this representation, the Court asked Corizon to file an update outlining "how, if at all, St. Luke's production affects its Motion to Compel." Dkt. 86. Corizon dutifully filed its notice and while conceding St. Luke's had produced chargemaster lists, it reaffirmed that St. Luke's had not responding to its other requests regarding how it determined those rates. Dkt. 87. Notably, Corizon did not withdraw the portion of its motion related to chargemaster lists.[19] Thus, the Court does not

---

[19] The Court freely admits its confusion over the status of Corizon's requests *as to the chargemaster lists themselves.* By all accounts, St. Luke's has produced the requested documents. Corizon admits as much. Dkt. 87, at 3. To be sure, Corizon identified an error in St. Luke's production relative to the year 2017, but it did not state the production was inadequate or incomplete. *Id.* In later briefing, Corizon stated that St. Luke's "finally produced some of their 'chargemaster' spreadsheets" but noted the spreadsheets "do not answer the question of how the prices are set." Dkt. 94, at 3. This language leads the Court to believe the St. Luke's production was accurate and responsive to that specific request. Furthermore, while Corizon "reserve[d] its rights to seek additional information" if it found St. Luke's submissions lacking, it has never done so. Dkt. 87, at 3, n.2.

know whether Corizon views St. Luke's responses as sufficient or not. To be clear, however, the Court finds that the information *is* relevant and needs to be turned over for the reasons set forth below.

In its briefing, St. Luke's argues Corizon's fixation on chargemaster rates is misplaced because the reasonableness of its chargemaster rates is not at issue; the real question is one of reasonable value of services. St. Luke's provides a good analogy for understanding valuation and pricing by discussing milk and the interplay between a grocer's price and a purchaser's willingness to pay that price. St. Luke's concludes by stating that "the reasonable value of the milk is the stated price—the full billed charge— that shoppers pay." Dkt. 88, at 9. The example is relevant and apropos, but it also underscores the reality that St. Luke's *will be* relying on its chargemaster rates (i.e. the full billed charge) in calculating damages. The Court agrees with St. Luke's that this case is not about its chargemaster rates. That said, 1) those rates and how they are set inherently affects the ultimate rates payors pay, but more importantly, 2) St. Luke's has all but stated it will be asking for those chargemaster rates from Corizon, so irrespective of reasonableness, Corizon should have opportunity to verify and investigate those documents as they undoubtedly play a role in St. Luke's "computation of . . . damages." Fed. R. Civ. P. 26(a)(1)(A)(iii). In short, the Court finds the chargemaster rates are relevant to this case and should be turned over—if production has not already occurred.

Regardless of any confusion surrounding the chargemaster rates themselves, it is clear St. Luke's has not produced responsive documents—or has produced very little in response—to Corizon's requests dealing with *how* the chargemaster rates are set.

St. Luke's argues these requests seek information that is irrelevant, and yet it also explains in detail how it has produced *some* responsive documents. Dkt. 88, at 11-17. The Court appreciates that St. Luke's is trying to work with Corizon; however, the efforts have led, in part, to more confusion; not less. For example, St. Luke's turned over some responsive documents in response to Corizon's Interrogatory No. 15 dealing with payor percentages. Corizon noted receipt of the materials, but commented that it cannot draw any conclusions from the raw data. St. Luke's responded, in turn, that the information is "sufficient to allow Corizon to determine the percentages" and that they can figure it out themselves. Dkt. 88, at 18. This response has an air of "hiding the ball." St. Luke's is the creator, possessor, and producer of data in question. Corizon is not. The Court does not know whether Corizon could ascertain the percentages from the information provided or not; however, it is clear St. Luke's can easily do so, and it should.

Regardless of the sporadic production to date, the Court again finds it appropriate to grant Corizon's motion (with one exception). The information at issue is relevant to damages, and will no doubt be used by the finder of fact to determine key issues in this case. Corizon must have a full and fair opportunity to discovery and analyze St. Luke's methodology. The one exception to this is Request for Production 38. In this request, Corizon seeks "all documents and communications constituting or reflecting all contracts or agreements with payors . . ." Dkt. 81, at 36. This request is far too broad, is intrusive, and raises concerns similar to those discussed early about privacy and anti-trust. The Court will not require St. Luke's to produce internal, private agreements and contracts with other entities as a part of this litigation. The information provided in responses to other requests

(as well as the Hospitals' responses to Corizon's first motion to compel) are sufficient for these purposes. Additionally, while not necessarily at issue in this Motion, the Court addresses two other details in its goal to maintain consistency and avoid confusion. First, the date range of 2010-2018 can be used as requested.[20] Second, if applicable,[21] St. Luke's responses may be limited to the treasure valley consistent with the Court's findings above.

Finally, in regard to St. Luke's objections to Corizon's requests for Medicare/Medicaid information (and any other objections for the matter), the Court notes that it is not foreclosing any future arguments on relevancy or the applicability of any of the discovered materials to the ultimate question of valuation. However, as stated above, those questions are for trial, not discovery.

Similarly, Corizon states that it might need to verify certain information and/or file additional requests once it reviews St. Luke's production. Again, those are issues for another day. The Court does not give prospective rulings. If future issues arise, those can be dealt with in due course.

In short, Corizon's Motion to Compel is GRANTED in PART and DENIED in PART as outlined above. St. Luke's shall respond (or more fully respond) to RFP 26-36,

---

[20] The Court is not concerned with the differing date ranges (between the two motions to compel) for two reasons. First, St. Luke's has already produced much of the information responsive to this request. Second, it appears much easier to produce this data (even from an expanded date range) as opposed to the entirety of the payor data at issue in the first motion to compel.

[21] Again, the Court does not know if there is a difference in chargemaster rates based on location. However, consistent with its holdings on Corizon's first Motion to Compel, information from outside of the treasure valley will not be helpful here and need not be turned over.

RFP 40, and Interrogatories 14 and 15. St. Luke's does not need to respond to RFP 38.[22]

### D. Motion for Discovery / Appoint Special Master (Dkt. 94)

*1. Legal Standard*

Federal Rule of Civil Procedure 53 provides that the Court may appoint a special master in order to:

> (A) perform duties consented to by the parties;
>
> (B) hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by:
>
>> (i)    some exceptional condition; or
>>
>> (ii)   the need to perform an accounting or resolve a difficult computation of damages; or
>
> (C) address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district.

Fed. R. Civ. Proc. 53(a). The Court has broad discretion in appointing a special master and in deciding the special master's duties. *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138 (9th Cir. 2002).

As the 2003 Advisory Committee notes point out, a pretrial master, including a discovery master:

> should be appointed only when the need is clear. Direct judicial performance of judicial functions may be particularly important in cases that involve important public issues or many parties. At the extreme, a broad delegation of pretrial responsibility as well as a delegation of trial responsibilities can run afoul of Article III.

---

[22] Similar to the Court's findings above, any information already produced stands and any information deemed confidential should be so designated (and, where appropriate, witnesses reviewing the information should sign an acknowledgement).

*Id*.; *see also* Hon. Shira A. Scheindlin & Jonathan M. Redgrave, Special Masters & E-Discovery: The Intersection of Two Recent Revisions to the Federal Rules of Civil Procedure, 30 Cardozo L. Rev. 347, 353 (2008) ("While there is no longer a requirement of an exceptional condition, the Advisory Committee cautions that such appointments should remain the exception and not the rule."). In deciding whether or not to appoint a special master, Rule 53(a)(3) requires the court to "consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay."

*2. Discussion*

In its Motion, Corizon recounts the history of this case, highlights the many ongoing discovery disputes, states there will likely be future discovery disputes, and postures that appointing a discovery master in this case will relieve the Court of these burdens and reduce overall delay. The Hospitals strongly oppose the Motion arguing that there is no need to appoint a discovery master since discovery is quite far along and that doing so would unnecessarily increase expenses.

Upon review, the Court finds a discovery master is not warranted in this case. While this is a somewhat large case, it is not so complex or technical that the addition of a discovery master is necessary. To be sure, Corizon's concern does not seem to be the nature of the case itself, but the time in which it takes the Court to rule on the discovery issues that have arisen/may yet arise. The Court truly appreciates Corizon's concern. The judicial

resources in the District of Idaho are stretched thin.[23] Nevertheless, the Court agrees with the Hospitals that there is little need to appoint a discovery master at this stage where much of the discovery in this case has already concluded.[24]

Corizon does not necessarily disagree that discovery is wrapping up. However, it expresses concern over certain anticipated disputes and postures that a discovery master will be able to deal with these issues in a timely fashion when they arise. The problem with this argument is that is it wholly speculative. While Corizon argues the merits of these disputes—and the Hospital's respond in kind—there is no guarantee they will even occur. Because the Court's decision today will affect the ongoing discovery in this case, there is no way to know whether these disputes will actually arise. The possibility of future disputes does not persuade the Court that a discovery master is necessary.[25]

In short, while there is no "compelling" standard Corizon must meet, the Court finds the posture of this case is not so dire that a special master need be appointed at this time. The Motion is DENIED.

## IV. CONCLUSION

The Court understands the underpinnings of the Hospitals' arguments relative to valuation and market rates. However, the way in which those figures are to be calculated

---

[23] That said, the District of Idaho has received some additional funding for staffing positions and should be better positioned to address pending disputes in a timelier fashion in the future.

[24] Additionally, while time is money, the Court agrees with the Hospitals that the added expenses associated with appointing a discovery master outweighs and time that could be saved in so doing.

[25] Additionally, the Court will not opine on the underlying disputes at this time. If the matters come up in the future, the parties should bring their disputes to the Court's attention in the usual manner.

is still undetermined. Corizon is, therefore, entitled to engage in discovery in order to defend against the Hospitals' claims and in support of its arguments regarding the calculation of fair market value. Broad discovery parameters are appropriate and fairness dictates both sides have an opportunity to glean information regarding their claims and defenses. Fed. R. Civ. P. 26. Accordingly, the Court will grant in part and deny in part Corizon's Motions to Compel within the parameters explained.

Because the Hospitals are in the best position to respond to these requests, the Court will not require any third parties to respond to the subpoenas Corizon sent. Accordingly, the Hospitals' Motion for Protective Order and Ada County's Motion to Quash are granted.

Finally, the Court will not appoint a special discovery master in this case. While discovery is not yet finished, it is nearing completion and there is no reason to bring a discovery master in at this stage.

## V. ORDER

1. Corizon's Motion to Compel Payor Rate Data (Dkt. 44) is GRANTED in PART and DENIED in PART as outlined above.

2. The Hospitals' Motion for Protective Order (Dkt. 53) is GRANTED. Ada County's Motion to Quash (Dkt. 55) is GRANTED. None of the Third Parties need respond to Corizon's subpoenas.

3. Corizon's Motion to Compel Chargemaster Rates (Dkt. 81) is GRANTED in PART and DENIED in PART as outlined above.

4. Corizon's Motion for Discovery and to Appoint Special Master (Dkt. 94) is DENIED.

5.  St. Luke's Motion to Seal (Dkt. 96) is GRANTED.

DATED: June 10, 2021

David C. Nye
Chief U.S. District Court Judge